# UNITED STATES DISTRICT COURT

## DISTRICT OF MARYLAND

| | |
|---|---|
| MALIBU MEDIA, LLC,<br>                    Plaintiff,<br><br>          v.<br><br>JOHN DOE subscriber assigned IP address<br>173.64.119.92,<br>                    Defendant. | Case No. 1:14-cv-0223-MJG<br><br>Assigned to:  Honorable Marvin J. Garbis<br>                    United States District Judge |
| MALIBU MEDIA, LLC,<br>                    Plaintiff,<br><br>          v.<br><br>JOHN DOE subscriber assigned IP address<br>71.200.143.209,<br>                    Defendant. | Case No. 1:14-cv-0257-CCB<br><br>Assigned to:  Honorable Catherine C. Blake<br>                    United States District Judge |
| MALIBU MEDIA, LLC,<br>                    Plaintiff,<br><br>          v.<br><br>JOHN DOE subscriber assigned IP address<br>76.100.228.15<br>                    Defendant. | Case No. 1:14-cv-0263-RDB[1]<br><br>Assigned to:  Honorable Richard D. Bennett<br>                    United States District Judge |

## DECLARATION OF MORGAN E. PIETZ RE: IPP, GUARDALEY, AND THE "ORAL CONTINGENCY AGREEMENT" MALIBU MEDIA, LLC HAD WITH ITS KEY WITNESS

---

[1] An identical version of this motion is being filed concurrently in all cases identified on the caption.  In addition, courtesy copies of these papers are being provided to Judges Titus, Grimm and Motz, due to the issues raised with respect to potential consolidation.

## INDEX OF EXHIBITS

| | |
|---|---|
| **Exhibit A** | Fieser Decl. |
| **Exhibit B** | Malibu Rogs re Oral Contingency Agreement with IPP |
| **Exhibit C** | Malibu Rog re Keith Lipscomb Negotiating Deal w IPP |
| **Exhibit D** | Translators Certificate |
| **Exhibit E** | Evidence from German Case Achache email to Brandt |
| **Exhibit F** | German Appellate Brief by BaumgartenBrandt- English |
| **Exhibit G** | German Appellate Brief by BaumgartenBrandt- - German |
| **Exhibit H** | Evidence from German Case ipoque Powerpoint - English |
| **Exhibit I** | Evidence from German Case ipoque Powerpoint - German |
| **Exhibit J** | State Court of Berlin Verdict - English |
| **Exhibit K** | State Court of Berlin Verdict - German |
| **Exhibit L** | Arheidt Declaration for Guardaley |
| **Exhibit M** | Arheidt Affidavit for IPP |
| **Exhibit N** | Wired Story on "Legal Blackmail Business" |
| **Exhibit O** | Achache Documents re Various Front Companies |
| **Exhibit P** | Fieser Affidavit Camelot Films - Karlsruhe |
| **Exhibit Q** | Description of IPP Software Identifying "GL Observer" on p 6 |
| **Exhibit R** | Supplementary and Original Affidavit of Barry Logan re Guardaley Observer |
| **Exhibit S** | Malibu Letter to Maryland Courts re Guardaley and IPP |
| **Exhibit T** | Job Advert for IPP using Guardaley email |
| **Exhibit U** | IPPInt.de Former and Current Imprint.dpf |
| **Exhibit V** | Beuroservice24 AG Imprint, Screenshot, Map and Description of Services |
| **Exhibit W** | Email from Jon Hoppe Requesting to Depose Client in 3024 Action |
| **Exhibit X** | Email Exchange w Jon Hoppe re IPP's Contingency Agr w Excerpt of Colorado Motion |
| **Exhibit Y** | Email from Jon Hoppe re Dismissal |
| **Exhibit Z** | Malibu's Response in Colorado re IPP Contingency w Select Exhibits |

## DECLARATION

I, Morgan E. Pietz, am over the age of 18.  I hereby declare as follows:

1.      I am a member in good standing of the State Bar of California, duly admitted to the practice of law in the state and federal courts of the State of California.

2.      I represent the John Doe ISP subscribers who plaintiff Malibu Media, LLC ("**Malibu**") accuses of being the defendant in this action, as identified on the caption above.  I have also represented dozens of other Internet users who have been similarly targeted by Malibu in copyright infringement cases in other jurisdictions.

3.      I am informed and believe that Malibu is a pornographer based in Los Angeles, California.  Malibu operates the www.X-Art.com website, which features videos of young-looking people engaged in actual, graphic sexual intercourse.  These movies typically have no plot, and little, if any, dialogue.

4.      Malibu is also a prolific copyright infringement litigant.  According to a nationwide PACER search I ran as of March, 3, 2014, since 2012, Malibu has filed approximately 1,817 copyright infringement suits nationwide.  With the exception of one proceeding in Pennsylvania, Malibu has never taken any of its cases to trial.  Rather, it settles all of its cases, sometimes with the aid of non-lawyer third party "settlement negotiators," who are essentially debt collectors who work the phones for Malibu to try and pressure defendants (particularly unrepresented ones) to settle.  Malibu is adept at leveraging the threat of linking people to pornography lawsuits, and the threat of astronomical statutory damages, to obtain quick settlements.

5.      I am informed and believe that the foundation for each of Malibu's lawsuits is technical data provided by IPP, a German company which, according to various declarations Malibu files, provides "forensic investigation services to copyright owners."  Curiously, sometimes IPP is referred to as IPP Limited, and in other cases it is referred to as IPP International, UG.  In either event, the declarant who speaks for IPP in the Malibu cases is almost always the same person, one Tobias Fieser, who apparently resides in Germany.

- 3 -

6.      As Malibu alleges in its complaints, and as Mr. Fieser typically explains in greater detail in his declarations that he offers in support of Malibu's motions for leave to take early discovery, IPP purports to monitor and log BitTorrent activity.  The complaints, the motions for early discovery, and Mr. Fieser's declarations, are mainly cookie-cutter copies from one case to the other, with only identifying details changed.  Attached hereto as **<u>Exhibit A</u>** is true and correct copy of Mr. Fieser's declaration filed in _<u>Malibu Media, LLC v. John Doe</u>_, D. Md. No. 1:14-cv-0223-MJG at ECF No. 4-5, on 1/27/14 (the "**Fieser Dec'l**.).  To the best of my knowledge, save for the caption, this would be representative of essentially identical declarations (save for the identifying information on the caption) that Mr. Fieser files in other Malibu cases nationwide.

7.      I am informed and believe that Malibu generally attempts to designate Fieser and IPP as a fact witnesses in its initial disclosures (presumably, to avoid providing written expert reports).  In actuality, as Mr. Fieser explains in the Fieser Dec'l., his testimony generally calls for specialized computer knowledge.  In the Fieser Dec'l., offered in support of an _ex parte_ motion for early discovery, Mr. Fieser avers, among other things:  "I am employed by IPP International UG ("IPP"), a company organized and existing under the laws of Germany, in its litigation support department." Fieser Dec'l, ¶ 4.  He explains that he "used forensic software named INTERNATIONAL IPTRACKER v 1.5 and related technology enabling the scanning of the BitTorrent file distribution network for the presence of infringing transactions involving Plaintiff's movies.  _Id._ ¶ 9.  He also swears that "I personally extracted the resulting data emanating from the investigation (_id._ ¶ 11) and that he personally compared a control copy of Malibu's movies "side-by-side with the corresponding digital media file identified by its hash value as set forth on Exhibit A" (_id._ ¶ 16).

(a)      **Malibu's "Oral Contingency Agreement" With Its Expert Witness IPP**

8.      In or around late December 2013, in a Malibu case where discovery was underway, Malibu served a response to defendant's interrogatories, with a verification page that is apparently

signed by one of Malibu's two owners, Collete Field.  Shortly thereafter, the defendant in that case filed a motion to compel further responses, attaching Malibu's allegedly deficient interrogatory response as an exhibit to the motion.  Attached hereto as **<u>Exhibit B</u>** is a true and correct copy of this interrogatory response, which was originally filed in Malibu Media, LLC v. John Doe, N.D. Ill. No. 1:13-cv-6312, at ECF No. 24-5, on 1/7/14.  The first interrogatory asked Malibu to identify "all persons or business entities that have an interest, financially or otherwise, in this litigation. . .".  In response, Malibu explained, "***Pursuant to an oral contingency fee agreement, IPP International UG is entitled to a small portion of the proceeds from the resolution of this case in consideration for the services it provided***."  <u>Exhibit B</u>, p. 2.

9.      In other verified interrogatory responses that came to light around the same time in another case, Malibu suggested that the agreement between it and IPP was negotiated by Malibu's lead national counsel, M. Keith Lipscomb.  I am informed and believe that Mr. Lipscomb oversees Malibu's litigation nationally, and is essentially the boss, as far as these cases are concerned, to whom the various local counsel around the country who are on the pleadings report.  Attached hereto as **<u>Exhibit C</u>** is a true and correct copy of this interrogatory response, which was originally filed in *Malibu Media, LLC v. John Doe*, S.D. Ind. No. 1:12-cv-1117, at ECF No. 151-3, on 1/9/14.  The fourth interrogatory asked Malibu to explain the circumstances by which it engaged IPP's services, and Malibu responded that it became aware of IPP "through its attorneys, ***specifically through communication with M. Keith Lipscomb***.  Plaintiff's attorneys negotiated the terms of Plaintiff's agreement with IPP International UG."  <u>Exhibit C</u>, p. 4. The fifth interrogatory inquired into Malibu's agreement with IPP, and Malibu responded that, "Plaintiff and IPP International have an oral agreement that was formed approximately 2.5 years ago.  ***This agreement has not ever been modified or amended***.  The terms of this agreement are confidential and constitute a trade secret."  <u>Exhibit C</u>, p. 5.

**(b)     Guardaley Was Caught By Another Technology Company In Germany Using Unreliable Methods And A "Falsified Bit Field" To Lure Infringers**

10.     I am informed and believe that Germany also has a law that makes statutory damages available for online copyright infringement.  As I understand it, the kind of industrial-scale, for-profit BitTorrent litigation that Malibu and a few other content owners engage in here actually got going in earnest in Germany a few years before this kind of litigation made its way across the Atlantic.

11.     I am informed and believe that Guardaley, Limited ("**Guardaley**") is a German company with offices in the UK, Spain, and some kind of sales presence in Los Angeles, California, that essentially does the exact same thing as IPP, except that Guardaley has been around for longer.  As detailed in section (e), below, IPP and Guardaley appear to actually be the same company, or, at a minimum, Guardaley was IPP's predecessor, and the two companies share some of the same personnel.

12.     The remainder of the factual assertions in this section (b), through section (d), are based upon a treasure trove of German court documents that originally came to light in connection with *Shirokov v. Dunlap, Grubb & Weaver, PLLC et al.*, D. Mass. No. 1:10-cv-12043, ECF No. 55, 6/13/11.  That lawsuit was a class action filed by the Booth Sweet law firm on behalf of various victims of early copyright "troll" cases in the United States.  Dunlap, Grubb & Weaver, the lead defendant, was a U.S. law firm that formed a joint venture called the US Copyright Group, together with Guardaley, to pursue infringement suits in the U.S.  Guardaley was another one of the defendants in the Massachusetts class action.

13.     I am informed and believe, based on a conversation with Jason Sweet, partner at Booth Sweet, that shortly after his firm filed the class action, he received in the mail an anonymous package containing German court documents relating to Guardaley.  Mr. Sweet subsequently had certified English translations prepared for the most important of the documents, and he filed some of them in the class action, in support of his firm's opposition to a motion to dismiss the class complaint. *Id*. Attached hereto as **Exhibit D** is a true and correct copy of the translator's certification for the documents (Exhibit F to Exhibit K), which were filed by Mr. Sweet's firm in the Massachusetts class action.

14.     I am informed and believe that on December 10, 2008, a Guardaley employee named Patrick Achache sent an email to Philipp Brandt, a partner at a Berlin law firm called BaumgartenBrandt, soliciting BaumgartenBrandt's participation in a copyright enforcement scheme. Attached hereto as **Exhibit E** is a copy of this email.  Eventually, BaumgartenBrandt did agree to participate in a copyright scheme with Guardaley, and, together, they sent out a substantial number of cease and desist letters to individuals in Germany.  Thus, BaumgartenBrandt became a German analogue of Mr. Lipscomb's law firm, meaning plaintiff's lawyers who contracted to represent copyright owner clients in the hopes of suing a large number of individuals for copyright infringement.  And in the same way that IPP logged IP addresses for Lipscomb's firm here, Guardaley logged IP addresses for BaumgartenBrandt.  As far as I can tell, and as evidenced by Exhibit E, Guardaley was the driving force in its relationship with BaumgartenBrandt.

15.     I am informed and believe that BaumgartenBrandt's relationship with Guardaley eventually deteriorated, resulting in litigation in the German courts.  Attached hereto as **Exhibit F** is the certified English translation of BaumgartenBrandt's German court pleading.  Attached hereto as **Exhibit G** the original document in German.

16.     I am informed and believe that one reason for the legal problems was that BaumgartenBrandt learned, no later than January of 2011, that there were serious flaws with Guardaley's data collection methods.  Exhibit F, p. 9.  Apparently, what happened was that a German tech company, called ipoque GmbH, conducted a "so-called test screening" of a film called *Antichrist* on the Internet.  *Id.*  During this procedure, "no part of the film *Antichrist* was offered in the BitTorrent network by ipoque GmbH, nor was this impression given on the Internet."  *Id.* at p. 10.  In other words, during the test screening, ipoque was not actually sharing / uploading pieces of the *Antichrist* movie to any other BitTorrent users.  *Id.*  Nevertheless, sometime thereafter, as a result of the test-screening, based on Guardaley's data, ipoque was cent a cease and desist letter demanding payment for infringement.  *Id.* The letter specifically asserted that ipoque had *uploaded* pieces of the movie *Antichrist* during the time of the test-screening.  *Id.* However, according to ipoque, it was "technically impossible" for any upload

- 7 -

to have occurred during the time in question, either in whole or in part, because ipoque was not making pieces available to other users. *Id.*

17.     I am informed and believe that ipoque's analysis of how Guardaley's "BitTorrent monitoring program" functions revealed that Guardaley was attempting to lure in infringers "by means of a falsified bit field." *Id.* at p. 10.  This means that when other BitTorrent clients would send availability inquiries to Guardaley, Guardaley had its logging software configured so that it would always respond back by saying that it had over 50% of a file available, even though this was not true. *Id.*

18.     I am informed and believe that although ipoque did not make any pieces of *Antichrist* available to share on BitTorrent during its test screening, ipoque apparently did send Guardaley a download availability inquiry at the time in question. *Id.* at. p. 11.  In other words, Guardaley recorded the fact that ipoque asked whether a file was available, and that occurred "even though ipoque GmbH neither offered an upload. . .nor effected a download." *Id.* Further, not only did ipoque not have any pieces to share, ipoque also "could not receive any parts of the copyrighted file" from Guardaley because Guardaley also did not actually have any pieces of the file available to share (even though it advertised that it did have pieces available). *Id.*

19.     Putting all of the foregoing facts together, what seems apparent is that if someone merely made an inquiry of Guardaley's software client, asking whether a file is *available* for download, Guardaley then simply recorded the IP address, assumed infringement, and eventually issued a demand letter, all without actually verifying to see whether any piece of a copyrighted file actually had been exchanged.  Or, as BaumgartenBrandt put it, "the consequence of this was that ipoque GmbH wrongfully received a cease and desist letter, on the basis of incorrect data collection." *Id.* at 11.

**(c)** **After Its Software Was Exposed As Flawed, Guardaley Then Attempted To Hide The Problem From The BaumgartenBrandt Law Firm**

20.     I am informed and believe that after ipoque received the cease and desist letter mentioned above, it contacted Guardaley, and sent a team consisting of ipoque's attorneys and its technical expert, one Dr. Frank Stummer, to Guaradley's offices for a meeting.  *Id.* at 11.  At the meeting, the ipoque team apparently gave Guardaley a PowerPoint detailed presentation about the flaws in the Guardaley software, and the details of the ipoque screen test and cease and desist letter.  *Id.*  Attached hereto as **Exhibit H** is a certified English translation of ipoque's PowerPoint presentation to Guardaley.  Attached hereto as **Exhibit I** is the original document in German.

21.     I am informed and believe that, according to BaumgartenBrandt, even though ipoque presented the detailed PowerPoint to Guardaley, Guardaley "intentionally failed to disclose the entire contents thereof" to BaumgartenBrandt.  Exhibit F, p. 11.  Thus, it was only when BaumgartenBrandt "happened to have contact with ipoque GmbH in January 2011, did it learn that [Guardaley] had made incorrect data determinations."  *Id.*  Representatives of BaumgartenBrandt then travelled to ipoque's offices in January, 2011, where they were presented with the same PowerPoint ipoque had previously shared with Guardaley.  *Id.*

22.     I am informed and believe that shortly after learning about the flaws with Guardaley's methodology, some kinds of discussions ensued whereby BaumgartenBrandt contemplated switching away from using Guardaley.  *Id.* at p. 6.

**(d)** **The State Court of Berlin Found The Allegations That Guardaley's Software Was Unreliable To Be Truthful And Ruled Against Guardaley**

23.     I am informed and believe that after BaumgartenBrandt began contemplating replacing Guardaley with another IP logging provider, Guardaley initiated legal proceedings against BaumgartenBrandt.  As I understand it, the gravamen of the proceedings was that Guardaley wanted to stop BaumgartenBrandt from engaging in supposed "unfair competition" by soliciting content owner

clients to switch away from Guardaley on account of its unreliable software.  These assertions as to the background of the case are drawn from the State Court of Berlin's May 3, 2011, verdict in the case (No. 16O55/11), a certified English translation of which is Attached hereto as **Exhibit J** (*see* pp. 2–8). Attached hereto as **Exhibit K** is the original document in German.

24.     I am informed and believe that, as explained by the German court, Guardaley sought a preliminary injunction which would enjoin, *inter alia*, BaumgartenBrandt from making the claim, (presumably to content owner clients; who Guardaley may have initially introduced to BaumgartenBrand in the first place), that "Guardaley Ltd. provides unreliable investigative services". Exhibit J, p. 6.  A preliminary injunction to that effect was initially granted, but BaumgartenBrandt appealed, seeking to have the preliminary injunction abrogated as to this issue.  *See* Exhibit F.

25.     I am informed and believe that the State Court of Berlin found that BaumgartenBrandt "have stated and made a credible showing that the statements" they made to the effect that Guardaley "provides unreliable investigative services, is true." Exhibit J, p. 11.  The Court reviewed the evidence proffered by ipoque, specifically the PowerPoint ipoque had given to both Guardaley and BaumgartenBrandt (Exhibit H), and stated, "It can be concluded that the film in question, 'Antichrist,' was running under the ipoque IP address in the context of a test screening, that ipoque GmbH did not offer the film as an upload." Exhibit J, p. 11.  The court further noted that even though Guardaley's software was supposed to only monitor uploads of files, Guardaley's software nevertheless "collected ipoque's IP data.  As a result, [Guardaley] sent—wrongfully—a cease and desist letter. . . .These credibly demonstrated facts permit the assumption that the statement in dispute [*i.e., that Guardaley "provides unreliable investigative services"*] is true." *Id.*  Accordingly, on that issue, Guardaley's preliminary injunction was set aside.  *Id.* at p. 2.  Guardaley was ordered to pay 4/5ths of the court's costs, and 3/4ths of BaumgartenBrandt and Mr. Nourbakhsch's non-court costs.  *Id.*

**(e)      IPP Is Simply Guardaley With A New Name**

26.      I am informed and believe that shortly after being tagged by its former lawyers for providing "unreliable investigative services" and for luring infringers "by means of a falsified bit field" in the foregoing German court proceedings, Guardaley set about trying to rebrand.  Since then, a partial list of aliases, which I understand to be associated with Guardaley or its principals, as supported by documents, includes: IP Equity, BP Equity, BaseProtect, and Intersda.  *See* Exhibit O, *infra*.

27.      The only other known declarant for IPP that I am aware of, other than Tobias Fieser, is a person named Daniel Arheidt.

28.      Attached hereto as **Exhibit L** is a copy of a technical declaration that I am informed and believe Mr. Arheidt submitted on behalf of the plaintiff in *Nu Image, Inc. v. Does 1-6,500*, D.D.C. No. 1:11-cv-301, ECF No. 5-2.  Notably: (1) Arheidt identifies himself as "Director of Data Services for ***Guardaley, Limited***") (¶1, emphasis added); and (2) the verification at the end of the declaration is dated February 17, 2011, which is while the court case between Guardaley and BaumgartenBrandt was still underway (recall, per Exhibit J, that the verdict was issued by the German court May 3, 2011).

29.      In comparison, attached hereto as **Exhibit M** is a declaration that I am informed and believe Mr. Arheidt submitted in a copyright infringement case filed on behalf of Voltage Pictures, LLC in Montreal, Canada.  Notably: (1) Arheidt identifies himself as a "consultant in the litigation support department of ***IPP Limited***" (¶1, emphasis added); (2) per the verification page at the end, he signs and has the declaration notarized in "Karlsruhe, Germany"; and (3) the declaration is dated August 24, 2011, which was a few months *after* Guardaley lost the court case against BaumgartenBrandt.

30.      Attached hereto as **Exhibit N** is a true and correct copy of a story by Nate Anderson published in *Wired* magazine on October 3, 2010.  It suggests, based on hacked emails that became public and went viral, that Guardaley was actually already in the habit of creating separate, under-capitalized shell companies even before the trouble with BaumgartenBrandt.  Andrew Crossley was a UK lawyer who did the same kind of thing in the UK as Mr. Lipscomb does here in the US, and as BaumgartenBrandt did in Germany, namely, pursue industrial scale BitTorrent litigation.  Crossley's

- 11 -

litigation in the UK apparently attracted the ire of the hacker group Anonymous, who (illegally, one presumes) hacked Crossley's emails and posted a large archive of them online. Anderson, the writer for *Wired*, apparently obtained the full collection of hacked emails, and his story quotes from a few of these hacked emails to and from Crossley. As Anderson told the story of how Guardaley became involved in the UK with Crossley, based on the hacked emails he reviewed,

> "after falling out with his detection company, Crossley turned to a young man named Terence[2], who is referenced above and who helped Crossley get into the settlement letter business. Terence then helped Crossley sign on with… Guardaley [*ellipsis in original for emphasis, no omitted text*]. Crossley writes about a 'guy I know called Patrick[3] who is good friends with Terence. Patrick is based in Germany with a high quality system. . . .
>
> The deal, for 15 percent gross, was done through Terence; no emails emerge from Guardaley. Even Crossley found the situation odd. 'Also, I note that Guardaley in the UK is registered as a dormant company. That needs to be changed if that is the contracting company. And why is there a company in the UK and why its it registered in Aldermaston? What's all that about? (as Peter Kay would say).'
>
> In response, Terence offers some intriguing details. '***GL [Guardaley] has a number of companies for monitoring and different ones are used depending on content and jurisdiction***. The data supplier for [ACS Law client] Mediacat will be a Swiss company to manage PR (you know how it is!).'
>
> Despite using the same tech, Guardaley apparently operates under numerous names. This means that each of the entities it creates needs a separate 'expert's report' verifying that the system is accurate. The one drafted for Guardaley itself wouldn't work; a new expert must be found.

---

[2] Based on a two-minute Google search, I readily identified this person's full name as likely being Terence Jin Tin Tsang, formerly a paralegal with UK law firms engaged in anti-piracy.

[3] Presumably, this correspondence refers to Patrick Achache, the principal behind Guardaley and its aliases.

'*An independent expert's report is in place for Guardaley, but your monitoring will be done through a different legal entity*,' wrote Terence. '*This will mean that we will need to get a new one created. There will be no problems, as the technology used will be exactly the same as Guardaley's.*' Exhibit L, p. 9 (emphasis added) (quoting hacked emails, published by *Wired*, between UK attorney Andrew Crossley and Guardaley's *de facto* representative in the UK, "Terrence").

31.     I am informed and believe that Guardaley's various shell companies tend to have a few things in common.  The commonality that probably gives rise to all the others is the involvement of Patrick Achache.  To my knowledge, Mr. Achache has yet to be linked directly to IPP, however, he is linked to most of Guardaley's other shell companies.  Attached hereto as **Exhibit O** is a collection of various documents I found relating to Patrick Achache, obtained by doing research in court records and on public Internet websites and Google that provide data about German and other European companies, which link Achache to various Guardaley shell companies.

32.     I am informed and believe that another commonality among the Guardaley shell companies is the locus of where their actual physical activities occur: Karlsruhe, Germany.  Note that Achache's signature on his affidavit in a U.S. case was signed in Karlsruhe, Germany.  Exhibit O, p. 8. So too was Arheidt's affidavit for IPP apparently executed by him in Karlsruhe.  Exhibit L.  Although Tobias Fieser is now too savvy to reveal where he executes his affidavits for Malibu's nearly 2,000 court cases nationwide, such that he generally now omits the required part of the declaration reciting where he signs them (*see* ECF No. 4-5), that was not always so.  Attached hereto as **Exhibit P** is a copy of an older declaration of Fieser's, filed in *Camelot Distribution Group, Inc. v. Does 1 through 5,865*, C.D. Cal. No. 11-1949, ECF No. 22-1, where Mr. Fieser purports in the verification at the end to have executed the declaration, in, of course, Karlsruhe.[4]

_____

[4] IPP's use of a Hamburg mailing address (which is not close to Karlsruhe) appears to be a front designed to put some distance between Guardaley and IPP.  See Exhibit V, and ¶ 40, *infra*.

- 13 -

33.     I am informed and believe that perhaps the most important commonality, pointed out in *Wired* story, is that, whatever the name of the Guardaley shell company, all of them purportedly use the exact same technology.  This appears to hold true for IPP.  Attached hereto as **Exhibit Q** is a true and correct copy of a declaration of Mr. Fieser, and accompanying Exhibit A thereto, filed in *Malibu Media, LLC v. John Does 1-5*, S.D.N.Y. No. 12-cv-2954, ECF No. 7, 5/8/12.  The exhibit, entitled "FUNCTIONAL DESCRIPTION, IPP International IPTRACKER v.1.2.1" is a document meant to provide greater detail on how *IPP's software* works.  Malibu used to file this explanatory exhibit along with Mr. Fieser's declaration, in somewhat regular fashion when it sought early discovery, to try and explain what Mr. Fieser was supposedly up to in these cases.  At some point, Malibu stopped providing courts with the additional detail set forth in this exhibit.  As relevant here, note the picture under "2.2 Visualisation [sic] of the process".  The server at the top of the illustration has the caption underneath it "*GL Observer*."  Presumably, this refers to  "Guardaley Observer," which is a name that Guardaley typically uses when describing its software suite.  To put that another way, the diagram meant to explain how IPP's software works appears to explain that the process works through Guardaley servers.

34.     For confirmation, attached hereto as **Exhibit R** are copies of supplemental and original affidavits of one Barry Logan, which I am informed and believe were filed in a Canadian case, *Voltage Pictures, LLC v. John Doe and Jane Doe*, Ontario Superior Court, Federal, Case No. T-2058-12.  Recall, per Exhibit M, that IPP, through Mr. Arheidt, previously provided computer forensic services to Voltage Pictures in at least one prior case in Canada.   According to Mr. Logan in his original affidavit dated December 7, 2012, now, he is "the owner and principal forensic consultant of Canipre, Inc" a company that Voltage has "retained to investigate whether its films were being copied and distributed by Canadian[s]".  Exhibit R, p. 4.  According to Mr. Logan's original affidavit, "Between September 1 and October 31, 2012, *forensic software called GuardaLey Observer v1.2* (the "Forensic Software") was used to scan BitTorrent networks for the presence of Voltage's copyrighted works."  Exhibit R, p. 6. (emphasis added).  After Mr. Logan was deposed in that case by a lawyer who intervened on behalf of the Samuelson-Glushko Canadian Internet Policy and Public Interest Clinic, Mr. Logan felt compelled

to correct himself.  Thus, in his supplemental affidavit he clarifies that when he referred to GuardaLey Observer v1.2, he was wrong (he attributes this to a "typographical error"), and "**_the software used in my investigation was GuardaLey Observer v.1.47, not v.1.2_**." Exhibit R, p. 1.

      35.     Further, the declarations offered on behalf of the various Guardaley shell companies by Tobias Fieser (Fieser Dec'l, Exhibit A); Daniel Arheidt (Exhibit L, for Guardaley; Exhibit M, for IPP); Patrick Achache (Exhibit O, for Guardaley); and Barry Logan (Exhibit R, for Canipre) are all essentially the same as to both substance and style.  Sometimes the declarations these people submit are pretty close to identical copies of one another.

      36.     In a formal response to Judge Titus and Judge Grimm in the consolidated two-judge panel proceeding that occurred in Maryland, Malibu dismissed a connection between IPP and Guardaley as "conspiracy theories" set forth by adverse counsel "with little evidence," stating emphatically that "[t]he German investigative company Guardaley has not reinvented itself as IPP, Ltd."[5]  *Malibu Media, LLC v. John Doe*, D. Md. No. 8:13-cv-360-RWT, ECF No. 15, 3/23/13, p. 17–18.  A copy of Malibu's letter brief in the proceeding is attached thereto as **Exhibit S**.  In that same letter, Malibu reiterated, as is typical, that they believe Mr. Fieser "will be a fact witness" rather than an expert and stated that "IPP, Ltd. and Guardaley have no common ownership or clients."  *Id.*  However, Malibu did have to admit that, "[o]ccasionally, the two companies work with each other, mainly because they are in the same common field and location."  *Id.*  Malibu then went on to dismiss the importance of German court proceedings mentioned above, in which the court abrogated part of an injunction and found BaumgartenBrandt's claim, that Guardaley's methods were unreliable, to be truthful, as "not proven in court. . .but merely alleged by a competitor[6]."  *Id.* at 15.  As far as Malibu Media is concerned, apparently, IPP's methods are "infallible and the process is not impeachable."  *Id.*

---

[5] Could this possibly be a bit of sophistry contingent upon the use of "IPP, Ltd." instead of "IPP International, UG"?

[6] While undersigned is certainly no expert on the German legal system, from the face of the documents, this assertion would seem to fly in the face of the State Court of Berlin's verdict of May 3, 2011.  Exhibit J.

37.     Attached hereto as **Exhibit T**, is a posting from what I am informed and believe is German-language job site (like Monster.com) called Vacancies24.de.  Although I do not speak German, it seems pretty clear that the posting, which was *originally recorded and saved by me on November 11, 2013*, advertises *a job at "IPP Int.*" for a "Systemplanner und ststemanalytiker."  However, tellingly, the email address applicants should use to apply for the job is "***jobs@guardaley.com***."

38.     I am informed and believe that "IppInt.de" is the URL for the IPP website.  Until somewhat recently, IPP's website listed its physical address as "Überseering 25, 22297 Hamburg, Deutschland."  Attached hereto as **Exhibit U** are copies of the former and current imprint on the IPP website.  Like the prior address, the current address given for IPP of "Hermannstraße 9, 20095 Hamburg, Deutschland," as well as the phone and fax number, are for actually virtual office / corporation services type company called Beuroservice24 A.G.  Attached as **Exhibit V** are documents I pulled from the Beuroservice24 A.G. website, and from Google, showing that IPP's physical address is consistent with being a front for a virtual office.

**(e)     Malibu's Dismissal Of The 3024 Action Before Judge Motz In Maryland**

39.     I previously represented the defendant in <u>Malibu Media, LLC v. John Doe</u>, D. Md. No. 8:13-cv-03024 (the "3024 Action") which was pending before Judge Motz in the District of Maryland.

40.     Attached hereto as **Exhibit W** is a true and correct copy of an email I received from Malibu Media's local counsel in Maryland, Mr. Jon Hoppe, on March 1, 2014, in reference to the 3024 Action.  Mr. Hoppe wrote, "I am interested in taking the deposition of your client in this case as soon as possible. Would you please contact me as soon as possible to set up an appropriate date for doing so?  If I do not hear from you shortly, I may have no other recourse than to act unilaterally on this issue. Thank you for your prompt attention to this matter."  <u>Exhibit W</u>.

41.     On March 3, 2014, I succeeded in reaching Mr. Hoppe on the phone in order to discuss his request to depose my client in the 3024.  At the outset of the call I indicated that I would be happy to

- 16 -

make the client available and we discussed dates at the end of March, beginning of April.  Mr. Hoppe inquired as to whether any extensions had yet been sought on the Rule 4(m) deadline, whereupon we both reviewed the docket and confirmed that as of that time, only one such extension had been sought.  I unambiguously informed Mr. Hoppe that I would stipulate to further extension of the Rule 4(m) service of process deadline in order to allow him to depose my client and determine whether it would be appropriate to name and serve my client as the defendant.  I asked Mr. Hoppe what he had heard about the "oral contingency issue," relating to IPP, which Mr. Hoppe professed not to know much about.  I explained to him some of what I knew about the issue and asked him if he could confirm whether an "oral contingency agreement" with IPP was in place or any of the details.  I indicated that I thought this issue was going to be a problem for Malibu, potentially resulting in exclusion, and I inquired as to whether Mr. Hoppe would be willing to provide me with some discovery on this topic. I believe I also offered to enter into a reasonable protective order when he said the information about IPP's compensation might be confidential. I indicated that I thought it would only be fair to allow my client some discovery, since his client wanted to depose my client. Mr. Hoppe became somewhat agitated at this request, and indicated that in his view, my client had no right to seek any discovery, as my client was not technically a party, and that he would seek sanctions if I filed anything on the docket on this issue (due to my client's non-party status).  I promised to send Mr. Hoppe a motion on this issue that I had recently reviewed that had been filed in a Malibu case in Colorado.  After I hung up, I then sent Mr. Hoppe a confirmatory email reviewing our conversation and attaching the Colorado motion, with exhibits thereto.

42.     Attached hereto as **<u>Exhibit X</u>** is a true and correct copy of my March 3, 2014, email exchange with Mr. Hoppe, including the first five pages of the Colorado motion seeking exclusion (I omitted the rest of the pages of the attachments) which were attached to my initial email.  This chain also includes both Mr. Hoppe's response to me of the same day, wherein he stated, among other things, that he would "have a comprehensive response" for me on the contingent fee witness issue, "shortly."

Finally, also on the email chain, is my reply email to Mr. Hoppe, which was also sent on March 3, 2014. Exhibit X.

43.     Subsequent to Mr. Hoppe's March 3, 2014, email to me, I received no further communications from him or anyone else about the 3024 Action.  The next communication about the case, three days later on March 6, 2014, was a CM/ECF email that a Notice of Voluntary Dismissal Without Prejudice had been filed by Mr. Hoppe, per Fed. R. Civ. P. 41(a)(1)(A)(i).

44.     Attached hereto as **<u>Exhibit Y</u>** is a true and correct copy of an email that Mr. Hoppe sent me about 45 minutes after he filed the Notice of Voluntary Dismissal in the 3024 Action, in which he explains his supposed reasons for dismissing the case.

**(e)     Malibu's Response On The Contingent Fee Witness Issue In Colorado**

45.     Attached hereto as **<u>Exhibit Z</u>** is a true and correct copy Malibu's response to a motion to exclude evidence from Tobias Fieser and IPP filed in *Malibu Media, LLC v. Benson*, D. Colo. No. 1:13-cv-2394-WYD, ECF No. 32, 3/20/14.  I omitted all of the exhibits that consisted of citations to Wikipedia articles and to portions of Malibu's bellwether trial transcript.  I included all declarations filed in Colorado, which were from Patrick Paige, Michael Patzer, and Tobias Fieser.  Although the Colorado papers reference a "Field" declaration, no such declaration was actually filed in Colorado

/ /

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 26, 2014, at Manhattan Beach, California.

Morgan E. Pietz, Esq., Declarant

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing paper with the Clerk of the Court using ECF, which will send notification of such filing to all attorneys of record.

*/s/ John Lowe*
John Lowe

DATED:        March 28, 2014